## Case No. 13,212.

### SPARKS v. The SONORA.

[Hoff. Op. 452.]

District Court, N. D. California. June 27, 1859.

SHIPPING—CARRIAGE OF PASSENGERS—REASONABLE ACCOMMODATIONS—NOTICE TO PASSENGER—DAMAGES.

[1. The shipowner is bound to furnish all reasonable and proper accommodations usually afforded to passengers on similar voyages in similar vessels, and such as are necessary to a reasonable degree of comfort, and to physical health and safety.]

[See Bailey v. The Sonora, Case No. 746.]

[2. A stateroom constantly filled with heated and somewhat offensive air, issuing directly from the boiler, to such an extent as to raise its temperature from 25° to 40°, with air and light somewhat obstructed by guards on which the port holes opened, and with the berth and bedding constantly wet, through defect in the arrangement of a pump, whose pipe ran through the stateroom, does not afford reasonably comfortable accommodations to a first-cabin passenger.]

[3. The ship's agent, when the comfortable staterooms are disposed of, must inform the passenger of the nature of the accommodations to be afforded him, and allow him to determine whether he will take the risk of such accommodations.]

[4. Where it cannot be determined that the unhealthiness or discomfort of a stateroom on a passage from Panama to San Francisco was the cause of the Panama fever with which the passenger was attacked, the expenses of his illness, and delays caused thereby, cannot be considered as part of the damages arising from the breach of the contract of carriage.]

[5. A sum equal to the passage money allowed as damages for the discomfort and annoyance experienced by a passenger from the failure of the ship to furnish a reasonably comfortable stateroom.]

[This was a libel for breach of contract by Harvey Sparks against the steamship Sonora.]

H. C. Clarke, for libelant.
Hall McAllister, for claimant.

HOFFMAN, District Judge. The libel in this case is filed to recover damages for a breach of a contract with libelant for his transportation as a passenger in the above vessel. It is admitted that Mr. Sparks took passage as a first-class passenger in New York to be transported to California, and that, in pursuance of that contract, he came on board the Sonora at Panama, and was conveyed to this port. The alleged breach of contract consists in the insufficient and uncomfortable character of the accommodations afforded to him. The grounds of complaint chiefly insisted on by the libelant are, first, that his stateroom was wholly unfit to be occupied by reason of its high temperature, arising from its vicinity to the boiler, and the existence of a ventilator which constantly filled it with heated air; second, by reason of offensive smells proceeding from the ventilator, and also various articles stowed upon the guard or small deck near the wheel, on which the port hole of the stateroom opened, and from the water-closets of the vessel. It is also alleged that a pipe which passed through the stateroom was leaky or defective, and that the bed and bedding of the libelant were constantly wet. It is further alleged that the crowded state of the steamer deprived the libelant of the comfort and reasonable accommodations to which he is entitled. All these causes, it is averred, not only caused the libelant to suffer temporary inconvenience and discomfort, but they affected his health, producing protracted and severe illness, thereby occasioning him great damage.

In support of these allegations much testimony was taken. It is unnecessary, however, to review it at length, for the principal facts, with the exception of some unimportant details, are clearly discernible, and the chief embarrassment in deciding the cause arises from the difficulty of determining with precision what is the character of the accommodations, and what the degree of comfort which the owner of a passenger vessel, employed as was the Sonora, agrees impliedly to afford to the cabin passengers. That some inconveniences and discomfort incidental to a voyage in tropical latitudes, and on a steamer conveying passengers in large numbers, must necessarily be submitted to, is obvious. But, in the absence of express stipulations, it is not easy to define the character of the accommodations which the passenger has a right to expect, or the degree of discomfort to which he must submit. It may be laid down, however, that the shipowner is bound to furnish all reasonable and proper accommodations usually afforded to passengers on similar voyages in similar vessels. That passengers are frequently carried on steamers in the trade in such numbers as to be inconsistent with their comfort, or perhaps their health, would, if the fact were established, afford no justification for a continuance of the abuse, for the passenger's contract must be construed to embrace a stipulation for such accommodations as are necessary to a reasonable degree of comfort, and to physical health and safety. The question in this case is, had the libelant such accommodations?

It appears that on either side of the main cabin of the vessel is a double row of staterooms. The outer, or those on the side of the vessel, have port holes by which light and air are admitted, but the inner rooms have none. These staterooms are reached by narrow passages, which lead from the cabin to the sides of the ship. On either side of these passages are the doors of the staterooms, two on each side, made of lattice work or blinds, and at the extremity of each passage way is a port hole. Beneath the port hole, and rising about four feet from the deck, is a square trunk or ventilator, which communicates with the deck below. The stateroom of the libelant being on the outside, or next the side of the vessel, its door was immediately adjacent to the ventilator. Any hot or offensive air which might rise through the ventilator was readily admitted, especially when the wind blew into the port hole, through the latticed door of the state room. The part of the lower deck with which the ventilator communicated was used as a baggage room. The floor was, with the exception of narrow passages on either side, occupied by the roof or top of the boiler, which, rising in a rounded form, was at its highest point perhaps four feet above the level of the floor. The boiler was covered with a jacket of felt and a casing of boards. It is obvious that the temperature of the baggage room must have been much raised by the presence of the boiler. Capt. Baby himself admits that the temperature of the baggage room was about 40 degrees higher than that of the air. This heated air, therefore, arising through the ventilator, must have increased the temperature of the staterooms on either side of the passages, especially of the outer rooms immediately adjacent to it. It accordingly appears from the testimony that the air of the stateroom of the libelant, as well as of those rooms in a similar situation on the opposite side of the ship, was higher in temperature by from 25° to 40° than that of the air in other staterooms of the vessel. The captain himself states that the air in the room of Judge Bakeby, who occupied a room corresponding to that of the libelant, on the other side of the ship, was on one occasion, when the heated air was rising in large quantities through the ventilator, and was blown inwards by the wind through the port hole, much hotter than that of one of the other rooms.

It is also claimed that this air was offensive, but there does not seem to have been any cause seen by which the air became foul, though, perhaps, a smell such as arises from machinery might have been more or less perceptible. It also appears that the port hole of libelant's stateroom opened upon the guard or small deck, near the wheel, on which were stowed various articles, chiefly wet provisions and other articles required to be kept cool. It is alleged that these provisions obstructed the air and light, and rendered the atmosphere foul. It is evident that the stateroom could not have been as comfortable or desirable as other staterooms, the port holes of which were on the sides of the vessel, and unobstructed by guards, etc. But from the evidence of the officers, as to the kind of articles stowed on the guards, and the precautions taken to keep it clean by frequent washings, it would seem that no very offensive odors could have arisen from that cause. The witnesses for the libelants, however, state very positively that an offensive smell from this cause was perceptible, and it is possible that in a tropical latitude the atmosphere of the stateroom may have been slightly affected by the close proximity of the guards. It does not appear to me, from the evidence, that any effluvia from the privy could have mingled with the other bad odors to which the witnesses have testified. It was at a considerable distance, great precautions were taken to keep it clean; and even if, occasionally, some inconvenience arose from that cause, it ought, I think, to be regarded as one of those inconveniences incidental to traveling in steamers. If the water-closets are properly situated and constructed, and if every measure to insure cleanliness is adopted, the fact that inconvenience occasionally results from their presence cannot be alleged as a breach of the contract with a passenger.

It is also shown by the testimony that the berth and bedding of the libelant were perfectly wet. Its extent and degree are variously stated, but I think it clear that it was sufficient to render his berth excessively uncomfortable, if not dangerous to health. Several witnesses testify in the most positive manner that the pipe was defective, and that they saw leaking through orifices in it. On the other hand, it is testified that if the pipe had been leaky, the working of the pump would have been affected, which was not the case. A plumber who examined the pipe and pump after the arrival of the vessel testifies that he could discover no leak in the pipe, and that none could have existed. The theory of the claimants is that the flange or plate which is counter sunk in the deck must have become loose from the working of the deck, and that water thus found its way along the pipe to the berth and stateroom of the libelant. The weather during the passage seems to have been fine. Supposing, then, that the claimants are right in attributing the escape of water to the cause assigned, it would seem to be one of those contingencies against which they ought to have provided. If it is impossible to prevent such leaks from occurring, then the pipe ought not to be led through the berths of passengers. It is at all events clear that a passenger who has contracted and paid for accommodations, compatible with a reasonable degree of comfort, and such as may be used without danger to health, ought not to be compelled to occupy a bed which is, to a considerable extent, saturated with, or even made damp by, water.

With regard to the other objections to the stateroom, which have been noticed, it is not so easy to decide. It is evident that, so far as the ventilation and port holes were concerned, the room on the opposite side of the passage, as well as the two corresponding rooms on the other side of the vessel, must have been liable to precisely the same objections. The inside rooms must also have been more or less affected by the ventilation, and, being without port-holes, perhaps might be considered, by many persons, less desirable. The purser testifies that he considers Mr. Sparks' room preferable to any of the inside rooms in the cabin; but this must be a caprice of taste, for the other inside rooms were not exposed to the heated and perhaps offensive air from the ventilator, which it is admitted raised the temperature of the rooms adjacent to it very considerably. It also appears that the room occupied by libelant and the one opposite to it, as well as those corresponding to them on the other side of the ship, are commonly used whenever the ship is full, and, so far as appears, without special complaint. On the other hand, it would seem that a room constantly filled with heated and somewhat offensive air, issuing directly from the boiler, and to such an extent as to raise its temperature from 25° to 40°, with air and light somewhat obstructed by the guards, on which the port holes opened, and with the berth and bedding constantly wet, through some defect in the arrangement of the pump, does not afford that reasonably comfortable accommodation which a first-cabin passenger, who pays the price demanded for his passage, has a right to expect. It seems to me that the agents of the company, who know the construction of the ship, and when the comfortable staterooms are disposed of, are bound to inform the passenger of the nature of the accommodations which are to be afforded him, nor can they shield themselves from liability by averring that no better stateroom was at their disposition. The libelant had a right to determine for himself whether he would sacrifice his comfort and risk his health by occupying a stateroom, the temperature of which was raised so considerably by its vicinity to, and the presence of, hot air from the boilers of the vessel.

If these views are correct, it follows that the contract to furnish the libelant with reasonably comfortable accommodations has

not been complied with, and he is entitled to damages for its breach; but the amount of damages which he should be allowed it is very difficult to estimate. He alleges that by reason of the insufficient accommodations afforded, his health was impaired, and for a considerable time after his arrival he was unable to attend to business. That he was ill when he arrived here is proved, but it is impossible to affirm that his illness was the direct and immediate consequence of the grievances he complains of. Dr. Harvey Hunt, a physician who was on board, does not hesitate, it is true, to ascribe his disease to the unhealthy character of his stateroom, but the nature of the case does not seem to admit of so confident a theory of casualty. The illness by which the libelant was attacked was the common Panama or coast fever. This fever, as is well known, is more or less an endemic in the country, and all travelers across the isthmus, and on this coast, are more or less liable to its attacks. Dr. Hunt, himself, admits that the only influence which the unfavorable conditions of Mr. Sparks' stateroom could have exercised were by diminishing his vital force, or power of resistance to disease, to render him more liable to its attacks, or to assist in developing any seeds of it which might have existed in his system. A cold, excessive fatigue, late hours, or dissipation, would have had the same effect. It is, therefore, not in the power of medical skill to assign to each of the many causes which may aid in engendering or developing so common a disease its precise influences, or to affirm that the unhealthiness or discomfort of a stateroom was either its immediate or efficient cause, or a cause without which the disease would not have appeared. The most that can be said is that the conditions were unfavorable to health, and those considerations may have exercised a material influence in producing the subsequent illness of the patient. But it does not seem to me that such an hypothesis, which necessarily leaves the degree to which the unhealthiness of the stateroom contributed to produce indefinite and conjectural, can justify the court in including, as part of the damages arising from the breach of contract, the physician's bill and other expenses of the libelant's illness; more especially as it appears that the stateroom was occupied by the libelant during a part only of the voyage, after which he obtained another, and as it is shown that he exposed himself to attacks of the fever by remaining on deck until a late hour, an imprudence which may also have been not without its influence in producing or aggravating the fever. No testimony was given to show any pecuniary damage to the libelant by reason of loss of time during his illness. The only damages which could be decreed would be the expenses of his illness, and such compensation or solatium for pain and suffering as might

be just. But, for the reasons assigned, I think the expenses and suffering caused by his illness after his arrival cannot be taken into account in fixing the damages for the breach of the contract.

It does not appear that the crowded state of the vessel caused any particular inconvenience to the libelant, except so far as it prevented him from obtaining another stateroom, nor that the officers willfully refused or neglected to promote his comfort as far as lay in their power. He does not appear to have been at much pains to inform the captain or superior officers of the wet condition of his berth and bedding, and they seem to have been under the impression that the orders given by the captain, on learning the existence of the leak through the steward, had remedied the evil. Had the captain been informed that the leak continued, it is, I think, tolerably clear that the libelant would have been assigned a sofa in the saloon, or elsewhere, to sleep on; an arrangement which, though not a full compliance with the contract, would have obviated the great discomfort and danger to the health of the libelant, to which, as he alleges, the occupation of the stateroom exposed him. But it is, I think, clear that the accommodations afforded to the libelant were not such as he had a right to expect under his contract, and that the company had no right to exact from a passenger the highest rate of fare, and then to assign him a room over or very near the boiler, which, though commonly used by passengers, was hot and unfit for occupation, and which, if assigned to passengers at all, they ought not to be compelled to occupy unless they have been informed of its situation and character, and have assented to the arrangement. The fact that this and the other staterooms in a similar situation were fitted up when the ship was first built, and have been commonly used as such, affords no justification for assigning them without previous notice to passengers; for the same argument would justify the construction of staterooms on top of the boiler, adjoining the water-closets, or any part of the ship which the desire of the owners to find a place in which to stow a passenger might lead them to devote to the purpose. The more just and reasonable view is that, although all the staterooms of a vessel cannot be equally comfortable and agreeable, and yet that there are parts of the ship which are unfit to be used for such a purpose, and that a stateroom liable to be constantly filled with air from a baggage room, the atmosphere of which is usually in temperature higher by 40° than the air, is not a place where passengers—it may be women and children—who have paid the highest price, are to be put, without notice or intimation of the nature of the accommodations they are to receive. Rejecting, then, as before stated, the claim for damages for loss of health as not sufficiently shown to have been produced by the breach of contract complained of, it has

appeared to me that a sum equal to the passage money paid by the libelant is a reasonable amount of damages for the discomfort and annoyance which the libelant has experienced by the failure of the company to fulfil their contract. A decree of $300 and costs must therefore be entered.